1

2

3

4

5

6

7

8                        **UNITED STATES DISTRICT COURT**

9                        **EASTERN DISTRICT OF CALIFORNIA**

10

11   JOAQUIN CEBALLOS CORONA,           )   Case No.: 1:12-cv-00246-JLT
                                        )
12                   Petitioner,        )   FINDINGS AND RECOMMENDATIONS TO
                                        )   DENY PETITION FOR WRIT OF HABEAS
13          v.                          )   CORPUS (Doc. 1)
                                        )
14   R. GOWER,                          )   ORDER DIRECTING THAT OBJECTIONS BE
                                        )   FILED WITHIN 21 DAYS
15                   Respondent.        )
                                        )
16   _____)

17          Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.

19                            **PROCEDURAL HISTORY**

20          Petitioner is in custody of the California Department of Corrections and Rehabilitation serving

21   an indeterminate sentence of life with the possibility of parole plus one year.  This sentence was

22   imposed by the Tulare County Superior Court after his conviction for one count of attempted murder

23   (Cal. Pen. Code §§ 664/187), and one count of leaving the scene of an accident (Cal. Veh. Code §

24   20001(a)). (Doc. 18, Lodged Documents ("LD") 4, pp. 1-2.  The jury also found that Petitioner had

25   personally used a deadly weapon within the meaning of California Penal Code § 12022(b)(1), and that

26   he had caused great bodily injury within the meaning of California Penal Code § 12022.7(a).  (Id.).

27          Petitioner appealed to the California Court of Appeals, Fifth Appellate District (the "5th DCA"),

28   which affirmed his conviction.  (LD 4).  Petitioner then filed a petition for review in the California

1  Supreme Court that was summarily denied on June 10, 2009.  (LD 5; 6).  Afterward Petitioner filed a

2  variety of state habeas corpus petitions that, ultimately, were denied.  (LD 7-14).

3      The instant petition was filed on February 14, 2012.  (Doc. 1).  Respondent filed the Answer on

4  May 8, 2012.  (Doc. 17).  Petitioner has not filed a Traverse.

5      Respondent does not argue that any of the claims in the instant petition remain unexhausted.

6  **FACTUAL BACKGROUND**

7  The Court adopts the Statement of Facts in the 5th DCA's unpublished decision[1]:

8  On July 21, 2006, Corona came by a house in Porterville where Salvador Calderon Amezcua
   (Calderon) was staying for a few days. Corona was going to clean the yard. Calderon told
9  Corona he did not want to help Corona clean the yard because he was only going to be there a
   few days and Corona was being paid to do it. Corona became angry and started to pick a fight
10 with Calderon. Calderon did not want to fight because he was "in a program" as a result of
   being on felony probation. Corona said he was going to kill Calderon and drive his car into
11 him. Corona left.

12 Corona returned to the house 15 to 20 minutes later. Corona was "very angry" with Calderon;
   he claimed Calderon was saying things about him that were not true. Calderon denied saying
13 anything about Corona. Corona again said "I'm gonna kill you" and told Calderon to get into
   Corona's car so they could look for the person who was saying things about Corona. Calderon
14 got into the car with Corona because Corona was very angry and he did not want to fight or
   have any problems with Corona, since Corona already had threatened him. The car, a brown
15 Cougar, was the same car Corona had bought from another individual earlier that month.
   According to Calderon, the car was not damaged.

16
   As Corona drove, he and Calderon were still having a conversation, but were not arguing;
17 Corona, however, was "very angry." Five to ten minutes later they found the other person, who
   Calderon knew only as "Chalechepo," on a bike in the street. Corona, who still was very angry,
18 got out of his car and confronted Chalechepo, who had gotten off his bike. Calderon, who also
   had gotten out of the car, told them not to fight. When Corona and Chalechepo started to punch
19 each other, Calderon left because he was on probation and did not want any trouble. According
   to Calderon, Corona was not acting like himself that day; he was always such a "nice person"
20 but that day Calderon did not recognize him at all. Calderon saw Corona with a beer that day,
   but did not know if his abnormal behavior resulted from alcohol consumption.

21
   Armando Garcia, a field worker, testified that around noon that day, he was riding his red
22 bicycle around Porterville. Around 12:15 p.m., Garcia saw Corona and Calderon, who he knew
   as Salvador, together in a car. Garcia had a conversation with Corona, who he knew from
23 work. As they were talking, Corona was drinking a beer, but Garcia did not notice if Corona
   was drunk. Garcia explained that Corona had become upset when another person began to
24 laugh at him because a car had been taken from him. When Corona was talking to the other
   person, the other person said Garcia had said something, so Corona had come to ask Garcia
25 "what was up." Garcia believed Corona's problem was with Calderon, but Corona came to him
   demanding whether he had said it. According to Garcia, Corona and Calderon were talking
26 about Corona's car being towed, and Garcia called Corona a "crybaby" because his car had

27

28 _____
   [1] The 5th DCA's summary of the facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1).
   Thus, the Court adopts the factual recitations set forth by the 5th DCA.

been taken from him.

Corona asked Garcia if he had said anything disparaging and Garcia said "No." Garcia testified they had an argument, and might have shoved each other and exchanged words, but he denied they hit each other. Garcia did not want any trouble and thought they were done, so he hopped on his bicycle and left the scene.

Garcia was heading to his house, thinking the confrontation was finished, when Corona hit him from behind with his car. Garcia was lying on the ground and losing a lot blood. An ambulance came. Garcia testified he was unable to breathe at certain points and "they were pumping" him. He thought he was going to die. His forehead was cut from the right eye to the center of his ear. He also hurt his arm and, at the time of trial, could not close his hand all the way. He received stitches and staples and was in the hospital for five days.

That day, Deydre McRoberts was visiting her cousin, Betty Watson, who lived in Porterville. Around noon, Watson saw "some guys" in a car stop and a man on a bicycle turn around and approach the driver's side of the car. McRoberts also saw the man on a bicycle and the car's driver stop in the street. The driver got out of the car holding a beer. The two men argued in Spanish. Watson called the police. As the man got back on the bicycle, the car's driver threw his beer at him and began to hit him in the head. The two began fighting; they were punching each other. The car's driver got into his car and the other man got back on his bike and took off riding. The car did a U-turn "real fast" and went in the same direction as the bicycle rider. The men then went out of the women's sight.

Johnny Plumlee, a manager at a Porterville automobile parts store, was walking back to the store at the end of his lunch break that day. As he came to an intersection, he saw in the middle of the road a bicycle and a vehicle with the door open, and two men having a fistfight. The men were throwing punches when a car stopped by and broke up the fight. Plumlee then saw one of the men start to push a red bicycle.

Plumlee continued walking on one side of the road. The man on the bicycle was on the sidewalk on the other side of the road; he was sitting on the seat propelling the bicycle with his feet on the ground. Plumlee heard a car accelerate; he turned to look and saw the car, which he estimated was traveling between 35 and 40 miles per hour, jump up on the curb and hit the man on the bicycle. The bicyclist hit his head on the passenger's side of the windshield and flew off the car about 15 yards into a wooden fence as the bicycle ended up under the car. The car also smashed into a metal mailbox that was cemented into the sidewalk. When the car's driver could not get his car into gear, he shut the engine off and walked away "like nothing had happened." While Plumlee was trying to get someone to call 911, the driver, who Plumlee identified as Corona, walked right past him.

Lewis Riley, a tow truck driver from Porterville, was heading back to his shop when he saw a car parked sideways on the curb, a man lying on the ground, and a bicycle lying underneath the car. Lewis stopped to assist and saw the man was lying face down in a puddle of blood. It looked like the man could not breathe, so Lewis got a towel, rolled him over, and saw a large gash in his head exposing the skull. Lewis put pressure on the wound and called his shop, telling them to call 911.

A Porterville Police Department community service officer responded to the scene. He saw a car parked sideways on the street that had a bicycle under the car's front end. Porterville Police Detective Carl Jordan also responded to the scene and began his investigation. Around 6:30 that night, Detective Jordan located Corona at his house. As he pulled up, he saw Corona sitting in the back of his driveway by a building drinking a can of beer. Corona appeared intoxicated and had trouble supporting himself. Corona appeared not to comprehend what the officers were telling him as they arrested him. Detective Jordan conducted an in-field viewing

3

or show-up. Witnesses Watson and McRoberts were brought to Corona's house; both separately identified Corona as the car's driver. Another officer brought Plumlee to the in-field show-up, who also identified Corona as the driver. Detective Jordan placed Corona under arrest, took him to the police substation for booking, transported him to a hospital to get blood drawn, and then delivered him to the main jail.

Porterville Police Officer Sam Garcia interviewed Armando Garcia, the victim, at the hospital soon after he was taken there. Officer Garcia thought the victim was being uncooperative and didn't want to answer questions. The victim said nothing happened and he just fell off his bike. The next day, the victim picked Corona's picture out of a photo lineup and told the officer Corona's name.

On July 22, 2006, Porterville Police Detective Sonia Silva interviewed Corona following waiver of his Miranda rights. Detective Silva had contacted Corona the day before, but he was too intoxicated to be interviewed. Corona said he was just driving to his sister's house when a bicyclist pulled out in front of him. Corona admitted he consumed three beers before driving that day and said he was thinking clearly when driving. Corona claimed he did not hit the victim very hard and he went to a nearby store to call an ambulance, but when he heard sirens he decided not to call. Corona admitted he did not render aid to the victim. Corona also said he went to the store to buy more beer, and that he left the scene because he was scared and knew he would be arrested. Detective Silva told Corona his statement might not fit with other information she had. Corona admitted talking to the victim before the collision but denied having an argument or being angry. Corona explained the discussion was about the victim making fun of him because his vehicle had been taken away from him, so he would have to get around on foot. Corona insisted he did not intend to hit the victim and it was an accident, as he was looking in the other direction and the victim veered in front of him. Corona denied having more beers when he returned to his house.

Defense Case

Toxicologist Jen Kearney testified that Corona's blood sample contained .30 percent blood alcohol concentration, which is a little over three times the legal limit. Kearney explained that between .30 and .40 percent it is possible to see [sic] unconsciousness or coma, but that depended on the individual's tolerance. Someone with a .30 blood alcohol content generally would have lowered inhibitions and social restraints, which could cause the person to spontaneously do things they otherwise wouldn't or to carry out an "obsessive idea." At that level, it would be very difficult, if not impossible, to conceive of a plan and act on it.

If a five foot six or five foot eight tall, 185 pound man's blood tested at .30 when drawn at eight p.m., his blood alcohol content at 12:00 p.m. would have been approximately .42 or .44, assuming he did not consume any alcohol after noon. If the person had seven 12–ounce beers between noon and eight p.m., his blood alcohol would remain the same at noon and at eight p.m. A person who was sober at noon would need to drink 21 beers to get to a .30 by eight p.m.

(LD 4).

# **DISCUSSION**

## I.    Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to

the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the

United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.

1    7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States

2    Constitution.  The challenged conviction arises out of the Tulare County Superior Court, which is

3    located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d).

4            On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of

5    1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.

6    Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997); Jeffries v.

7    Wood, 114 F.3d 1484, 1500 (9th Cir. 1997), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other*

8    *grounds by* Lindh v. Murphy, 521 U.S. 320 (holding the AEDPA only applicable to cases filed after

9    statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

10   governed by its provisions.

11           II.    Legal Standard of Review

12           A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless he

13   can show that the state court's adjudication of his claim: "(1) resulted in a decision that was contrary

14   to, or involved an unreasonable application of, clearly established Federal law, as determined by the

15   Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable

16   determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

17   § 2254(d); Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003); Williams v. Taylor, 529 U.S. at 412-413.

18           A state court decision is "contrary to" clearly established federal law "if it applies a rule that

19   contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts

20   that is materially indistinguishable from a [Supreme Court] decision but reaches a different result."

21   Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams, 529 U.S. at 405-406 (2000).

22   Consequently, a federal court may not grant habeas relief simply because the state court's decision is

23   incorrect or erroneous; the state court's decision must also be objectively unreasonable.  Wiggins v.

24   Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409).

25           In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 770 (2011), the U.S. Supreme Court

26   explained that an "unreasonable application" of federal law is an objective test that turns on "whether

27   it is possible that fairminded jurists could disagree" that the state court decision meets the standards set

28   forth in the AEDPA.  If fairminded jurists could so disagree, habeas relief is precluded.  Harrington,

131 S.Ct. at 786.   The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011).  Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."  Harrington, 131 S.Ct. at 787-788.

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500.  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists."  Id.; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for

harmlessness).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), the <u>Strickland</u> prejudice standard is applied and courts do not engage in a separate analysis applying the <u>Brecht</u> standard.  <u>Avila v. Galaza</u>, 297 F.3d 911, 918 n. 7 (9th Cir. 2002); <u>Musladin v. Lamarque</u>, 555 F.3d 830, 835 (9th Cir. 2009).

**III.  Review of Petitioner's Claims.**

The instant petition itself alleges the following as grounds for relief: (1) the trial court erroneously denied Petitioner's motion to replace trial counsel pursuant to <u>People v. Marsden</u>, 2 Cal.3d 118 (1970)("<u>Marsden</u>"); (2) ineffective assistance of trial counsel; (3) ineffective assistance of appellate counsel.

A.  <u>Denial of Petitioner's Marsden Motion.</u>

Petitioner first contends that the trial court erred in denying his <u>Marsden</u> motion to replace trial counsel.  This contention is without merit.

1.  <u>The State Court Proceedings</u>.

Petitioner raised the issue of denial of his <u>Marsden</u> motion in a petition for writ of habeas corpus in the Superior Court, which denied the claim as follows:

> With the exception of the ineffective assistance of counsel claim, all the issues raised by the petitioner in the instant writ were raised in an appeal filed with the Fifth District Court of Appeals.  The appellate court rejected the claims filed by the petitioner and the judgment was affirmed in its entirety.

(LD 12).

Both the 5th DCA and the California Supreme Court summarily denied the claim without comment or reasoned decision.  The Court's review of this record indicates that the Superior Court erred in concluding that the <u>Marsden</u> issue had been raised in the direct appeal.  The issue was not raised by Petitioner in his Opening Brief and the 5th DCA's unpublished opinion does not address the issue in any way.  Accordingly, the Court concludes that the Superior Court's rejection of this claim without a reasoned decision, but instead based on the mistaken belief that the claim had already been litigated on direct appeal, means that Petitioner had properly presented this issue to the state court, which then did not address the issue on its merits.

Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). Stanley v. Cullen, 633 F.3d 852, 860 (9th Cir. 2011); Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.2003); Greene v. Lambert, 288 F.3d 1081, 1089 (9th Cir.2002); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." Himes, 336 F.3d at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." Harrington, 131 S.Ct. at 784.[2]

2. Federal Standard.

The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and therefore is properly considered in a habeas proceeding. Bland v. California Dep't of Corrections, 20 F.3d 1469, 1475 (9th Cir. 2000). It is well settled that when a criminal defendant voices a seemingly substantial complaint about counsel, the trial judge should make a thorough inquiry into the reasons for the defendant's dissatisfaction. See id. at 1475-76; United States v. Robinson, 913 F.2d 712, 716 (9th Cir. 1990). While a defendant has the right to make a motion for new counsel based on the defendant's perception of ineffective assistance of counsel, he does not have an automatic right to the substitution of counsel simply because he is dissatisfied with appointed counsel's performance. Jackson v. Ylst, 921 F.2d 882, 888 (9th Cir.1990). The Sixth Amendment guarantees effective assistance of counsel; it does not guarantee a "meaningful relationship" between an accused and his attorney. See Morris v. Slappy, 461 U.S. 1, 14 (1983).

---

[2] When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo. Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir.2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir.2003). The Court notes the standard for de novo review only to point out that, under either standard, the Court concludes that the issue is without merit.

8

1    The ultimate inquiry in a federal habeas proceeding is whether the petitioner's Sixth

2    Amendment right to counsel was violated.  Schell v. Witek, 218 F.3d. 1017, 1024-25 (9ᵗʰ Cir. 2000)(*en*

3    *banc*).  The habeas court considers whether the trial court's denial of or failure to rule on the motion

4    "actually violated [petitioner's] constitutional rights in that the conflict between [petitioner] and his

5    attorney had become so great that it resulted in a total lack of communication or other significant

6    impediment that resulted in turn in an attorney-client relationship that fell short of that required by the

7    Sixth Amendment."  Id. at 1026.

8           3.  Analysis.

9           Several reasons require the denial of this claim.  First, neither Petitioner nor his counsel ever

10   made a formal request for a Marsden hearing nor expressly advised the court that a Marsden inquiry

11   was appropriate.  Although defense counsel on two occasions indicated that there "may" be a Marsden

12   problem, the issue never proceeding beyond that point to an actual request or motion for a Marsden

13   hearing.  Petitioner maintains that "the record shows the trial court repeatedly ignored evidence which

14   *suggested* that a fundamental breakdown *may have occurred* in the attorney-client relationship," and

15   "error that was exacerbated by the fact that [Petitioner] does not speak or understand English"

16   (Emphasis supplied).  (LD 11, p. 11).  However, even cases cited by Petitioner in his state habeas

17   petition note that the trial court must conduct a hearing "[w]hen a defendant asks the trial court to

18   appoint new counsel on the ground of ineffective assistance of counsel."  (LD 11, p. 10) (Emphasis

19   supplied).   The trial judge cannot be expected to exercise judicial clairvoyance to divine that a

20   Marsden hearing is necessary in the absence of a request by either the defendant or his attorney.  See

21   Bland v. California Dep't of Corrections, 20 F.3d 1475-6.  Petitioner does not cite, and the Court is

22   unaware of, any precedent requiring such a sua sponte inquiry.³

23          Second, even assuming a motion had been made, a hearing conducted, and the motion denied by

24   the judge, the record does not contain any basis for removing defense counsel under Marsden.

---

³ The petition alleges that, at one point, defense counsel told the judge that Petitioner had complained about counsel not
visiting him and not making appearances in court.  (Doc. 1, p. 9).  The judge indicated he would put off any further inquiry
until the next hearing, which would give counsel time to "meet with him again and see if that's what he wants to do, and
we'll go from there."  (Id. at p. 10).  Petitioner indicates that, at future hearings, the issue was not raised again.  Under such
circumstances, i.e., where neither Petitioner nor his attorney pursued the matter at subsequent hearings, the trial court can
hardly be faulted for failing to raise the issue on its own.

1   Petitioner does not set forth within his petition any specific grounds that would support the granting of
2   a Marsden motion.  Rather, he appears to rely upon the claims of incompetent representation contained
3   in his second claim for relief.  As discussed more fully in the following section, such grounds fail to
4   meet the federal standard for ineffective assistance of counsel.  In brief, they are premised upon
5   counsel's failure to impeach Calderon, the eyewitness, at the preliminary hearing and at trial, to
6   impeach him with his prior criminal convictions, and to point out to the jury the many inconsistencies
7   between Calderon's statements to the police at the time of the crime, during the subsequent
8   investigation, and at trial.  Significantly, such a claim encompasses Calderon's trial testimony and thus,
9   could not have been made before trial because Calderon had not yet testified.  In other words, even had
10  Petitioner pursued his pre-trial Marsden motion based on his attorney's ineffectiveness in impeaching
11  Calderon, such a claim would have failed since it is premised upon allegedly deficient representation by
12  counsel which occurred later *at trial*.

13          The record discloses that Petitioner's primary pretrial complaints with his attorney were that he
14  did not visit Petitioner frequently enough and that he had not appeared at several hearings.  Apart from
15  these two claims, as related to the court by counsel, nothing else in the record contains even the
16  slightest suggestion that, prior to trial, counsel was ineffective or, more importantly, that the attorney-
17  client relationship had become so strained that substitution of counsel was required.  While Petitioner
18  may have disagreed with various tactical decisions by defense counsel, including the frequency of
19  counsel's visits with his client and his inability to attend certain hearing, those disagreements did not
20  warrant substitute counsel.  See Brookhart v. Janis, 384 U.S. 1, 8 (1966) ("[A] lawyer may properly
21  make a tactical determination of how to run a trial even in the face of his client's incomprehension or
22  even explicit disapproval.")  Regarding Petitioner's allegations of limited visitations, Petitioner fails to
23  explain how that affected the quality of counsel's representation or the ultimate result.  Ineffectiveness
24  is not established without a showing of how the deficient consultation caused harm.  United States v.
25  Rogers, 769 F.2d 1418, 1425 (9th Cir.1985).  Petitioner's desire for more frequent visits is simply not a
26  legal basis for substituting counsel.

27          Finally, even assuming that Petitioner's technical point is well taken, i.e., that counsel should
28  have been more diligent in demanding a Marsden hearing rather than allowing it to be put off,

10

1   Petitioner has not and cannot establish from this record that the error was in any way prejudicial.  As

2   discussed more fully in the next argument, multiple independent witnesses confirmed Petitioner's

3   egregious conduct in pursuing the victim in his car, running up over the curb, and crashing into the

4   victim on his bicycle.  Such highly prejudicial evidence would have been presented against Petitioner

5   regardless of whom the trial court appointed as Petitioner's counsel. The Court will not presume

6   prejudice, and nothing in the record shows that the trial court's failure to schedule a <u>Marsden</u> hearing

7   had "a substantial and injurious effect or influence in determining the jury's verdict." <u>Brecht v.</u>

8   <u>Abrahamson</u>, 507 U.S. 619, 623.  Accordingly, the Court finds that any error was harmless.

9           B.  <u>Ineffective Assistance of Trial Counsel</u>.

10          Petitioner next contends that his Sixth Amendment rights were violated because he was denied

11   the effective assistance of trial counsel.  This contention is also without merit.

12               1.  <u>The Superior Court's Opinion</u>.

13          The Superior Court rejected Petitioner's claim as follows:

14          Petitioner has raised no claims which rise to the level of ineffective assistance of counsel or
            [sic] a due process or equal protection violation.  Accordingly petitioner's Petition for Writ of

15          Habeas Corpus is denied.

16   (LD 12).  As with the previous claim, the state supreme court summarily rejected this claim.

17               2.  <u>Federal Standard</u>.

18          Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the

19   Fourteenth Amendment. <u>Evitts v. Lucey</u>, 469 U.S. 387, 391-405 (1985). Claims of ineffective

20   assistance of appellate counsel are reviewed according to <u>Strickland 's</u> two-pronged test. <u>Miller v.</u>

21   <u>Keeney</u>, 882 F.2d 1428, 1433 (9th Cir.1989); <u>United States v. Birtle</u>, 792 F.2d 846, 847 (9th

22   Cir.1986); <u>see</u> <u>also</u> <u>Penson v. Ohio</u>, 488 U.S. 75(1988) (holding that where a defendant has been

23   actually or constructively denied the assistance of appellate counsel altogether, the <u>Strickland</u> standard

24   does not apply and prejudice is presumed; the implication is that <u>Strickland</u> does apply where counsel

25   is present but ineffective).

26          To prevail, Petitioner must show two things. First, he must establish that appellate counsel's

27   deficient performance fell below an objective standard of reasonableness under prevailing professional

28   norms. <u>Strickland v. Washington</u>, 466 U.S. 668, 687-88, 104 S.Ct. 2052 (1984). Second, Petitioner

11

1   must establish that he suffered prejudice in that there was a reasonable probability that, but for

2   counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable

3   probability" is a probability sufficient to undermine confidence in the outcome of the appeal. Id. The

4   relevant inquiry is not what counsel could have done; rather, it is whether the choices made by counsel

5   were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir.1998).

6          With the passage of the AEDPA, habeas relief may only be granted if the state-court decision

7   unreasonably applied this general Strickland standard for ineffective assistance.  Knowles v.

8   Mirzayance, 556 U.S. ___, 129 S.Ct. 1411, 1419 (2009).  Accordingly, the question "is not whether a

9   federal court believes the state court's determination under the Strickland standard "was incorrect but

10  whether that determination was unreasonable–a substantially higher threshold."  Schriro v. Landrigan,

11  550 U.S. 465, 473 (2007); Knowles v. Mirzayance, 556 U.S. ___, 129 S.Ct. at 1420.  In effect, the

12  AEDPA standard is "doubly deferential" because it requires that it be shown not only that the state

13  court determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

14  Gentry, 540 U.S. 1, 5 (2003). Moreover, because the Strickland standard is a general standard, a state

15  court has even more latitude to reasonably determine that a defendant has not satisfied that standard.

16  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)("[E]valuating whether a rule application was

17  unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway

18  courts have in reaching outcomes in case-by-case determinations").

19         As with the previous claim, because the issue was summarily denied by the state court without

20  a reasoned decision, the Court will employ the independent review standard, but finds the claim

21  without merit under both the independent and de novo standards.

22                 3.  Analysis.

23         As mentioned in the previous section, Petitioner's complaints about his counsel's

24  representation revolve around counsel's purported ineffectiveness in cross-examining and impeaching

25  Calderon regarding the various versions of events that Calderon related to police investigators, to the

26  court at the preliminary hearing and at trial, and with his prior felony convictions. Petitioner points out

27  that, comparing the various versions of Calderon's story, discrepancies appears as to whether he

28  looked back to see Petitioner and the victim fighting, whether he saw someone on a bicycle, and

12

1   whether he heard the crash when Petitioner's car hit the victim. As Respondent correctly points out, it

2   is not reasonable to conclude that, had counsel brought these discrepancies to the attention of the jury,

3   that the jury would have reached a different result.

4         Calderon was but one of many witnesses, most of them entirely independent of Petitioner and

5   Calderon, who witnesses all or portions of the events resulting in the crime.  Witnesses McRoberts and

6   Watson witnessed Petitioner and the victim fighting and then saw Petitioner get in his car and chase

7   after the victim at a high rate of speed.  The two women later identified Petitioner as the driver of the

8   vehicle.  Jason Plumlee was walking near the incident and saw it as it transpired, including when

9   Petitioner drove his car over the curb and into the victim which propelled him fifteen yards and into a

10  wooden fence.  Plumlee identified Petitioner at trial and indicated that, following the collision with the

11  victim, Petitioner shut off the motor of the car and walked away "like nothing had happened."

12        Petitioner, for his part, does not deny the collision, but insists that the victim pulled out in front

13  of him and that it was an accident.  Also, at trial, Petitioner's defense was not that the collision did not

14  occur, but that Petitioner was so inebriated that he could not form the intent or plan to kill the victim,

15  or, alternatively, that the accident was the result of driving while intoxicated, not an intentional

16  attempt to murder the victim.

17        Under those circumstances, as indicated in the 5th DCA's decision, there was overwhelming

18  evidence that Petitioner, highly inebriated and having just had a heated altercation and physical fight

19  with the victim, purposely pursued the victim in his car and intentionally ran over him, thus making

20  him culpable for attempted murder, assault with a deadly weapon, and leaving the scene of an

21  accident. Even had trial counsel vigorously cross-examined Calderon and studiously pointed out to the

22  jurors the many discrepancies in his story as, according to Petitioner, it "evolved" over time, it is not

23  reasonable to believe that this would have influenced the outcome of the jury.  Because Petitioner has

24  not established either deficient performance or prejudice under <u>Strickland</u>, the claim must be rejected.

25        C.  <u>Ineffective Assistance of Appellate Counsel.</u>

26        Finally, Petitioner claims that his right to the effective assistance of appellate counsel was also

27  denied.  This contention too is without merit.

28  *///*

13

1        1. The Superior Court's Opinion.

2        The Superior Court rejected Petitioner's claim as follows:

3        Petitioner has raised no claims which rise to the level of ineffective assistance of counselor
         [sic] a due process or equal protection violation.  Accordingly petitioner's Petition for Writ of
4        Habeas Corpus is denied.

5   (LD 12).  The state supreme court summarily rejected this claim. As with the previous two claims,

6   because the issue was summarily denied by the state court without a reasoned decision, the Court will

7   employ the independent review standard, but finds the claim without merit under both the independent

8   and de novo standards.

9        2. Federal Standard.

10       In challenges to the effective assistance of appellate counsel, the same standards apply as with

11  the claims of ineffective assistance of trial counsel.  Smith v. Robbins, 528 U.S. 259, 285 (2000); Smith

12  v. Murray, 477 U.S. 527 (1986).   In Smith, the United States Supreme Court indicated that an appellate

13  attorney filing a merits brief need not and should not raise every non-frivolous claim.  Robbins, 528

14  U.S. at 288.  Rather, an attorney may select from among them in order to maximize the likelihood of

15  success on appeal.  Id.  As a result, there is no requirement that an appellate attorney raise issues that

16  are clearly untenable.  Gustave v. United States, 627 F.2d 901, 906 (9th Cir. 1980); see also Gillhan v.

17  Rodriguez, 551 F.2d 1182 (10th Cir. 1977).

18       3. Analysis.

19       As discussed previously, Petitioner's claims of ineffective assistance of trial counsel and

20  improper denial of his Marsden motion both lack merit.  This simple conclusion precludes Petitioner's

21  Strickland claim because he cannot show appellate counsel's conduct was deficient for failing to raise a

22  non-meritorious claim, nor can he show prejudice from his appellate counsel's failure to pursue an

23  appeal that included non-meritorious claims.  E.g., Rhoades v. Henry, 638 F.3d 1027, 1036 (9th Cir.

24  2011)(appellate counsel's performance was not deficient for failing to investigate or pursue claims on

25  appeal where "neither would have gone anywhere").  Accordingly, Petitioner's final claim of

26  ineffective assistance of appellate counsel must be rejected.

27                              **RECOMMENDATION**

28       Accordingly, the Court RECOMMENDS that Petitioner's Petition for Writ of Habeas Corpus

                                            14

1    (Doc. 1), be DENIED.

2          This Findings and Recommendation is submitted to the United States District Court Judge

3    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local

4    Rules of Practice for the United States District Court, Eastern District of California.  Within 21 days

5    after being served with a copy of this Findings and Recommendation, any party may file written

6    objections with the Court and serve a copy on all parties.  Such a document should be captioned

7    "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be

8    served and filed within ten days (plus three days if served by mail) after service of the Objections.  The

9    Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties

10   are advised that failure to file objections within the specified time may waive the right to appeal the

11   Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12

13   IT IS SO ORDERED.

14       Dated:   **October 17, 2014**                        _____**/s/ Jennifer L. Thurston**

15                                                            UNITED STATES MAGISTRATE JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28